NEW YORK COUNTY.—HON. D. G. ROLLINS, SURROGATE.—November, 1883.

WHITTEMORE V. BEEKMAN.

*In the matter of the judicial settlement of the account of* HENRY R. BEEKMAN, *and others, executors of, and trustees under the will of* HENRY LAWRENCE, *deceased.*

Testator, by his will, gave to his executors a full power of sale and con-

version, and directed the residue of his estate, after payment of debts, legacies, etc., to be divided into three equal parts or shares; one of which he ordered his executors to distribute equally among eleven nephews and nieces; and each of the others of which he gave to said executors as trustees for a sister, for life, with respective remainders to the same nephews and nieces, in equal shares.

The trustees were directed to invest and re-invest the personal estate, in such manner as they deemed best, either in the bonds or stocks of the U. S., or in those of the State of New York, or in other specified modes. They accordingly purchased U. S. 5 per cent. bonds, extended at the pleasure of the government, at a premium, on account of the two trusts created by the residuary clause of the will, of the par value of $467,000, through a broker to whom they paid commissions to the amount of $583.

These bonds were soon afterwards called, and paid with interest to a date subsequent to the date of payment; whereby there resulted an accretion of interest, in the nature of a bonus, and the disappearance of the premium above the par value of the principal.—*Held,*

1. That the broker's commissions were a lawful expenditure, and a charge on the principal of the particular fund on account of which they were incurred.

2. That the excess of interest received on redemption of the bonds must be credited to principal and not to income.

3. That the loss of premium, resulting from the redemption must be borne by the principal, and not by the income.

Farwell v. Tweddle, 10 *Abb. N. C.,* 94—followed.

TESTATOR, by his will, after directing the payment of debts, funeral expenses, and numerous pecuniary and specific legacies, provided, by the twenty-ninth clause: "All and singular the rest, residue and remainder of my estate . . . . . I order and direct to be divided by my executors into three equal parts or shares, and one of said equal parts or shares I give, devise and bequeath to my executors . . . . . in trust, nevertheless, upon my death" (in case testator's brother died before testator—as he did) "to grant, convey, assign," etc., "the said equal share of my residuary estate to my nephews and nieces as follows: . . . . . " The two other shares of said residue were

given separately to the same trustees, in trust to invest and reinvest the same, from time to time, in such manner as they might deem best, in the bonds or stocks either of the United States, or of the State of New York, or on bonds and mortgages, or in the bonds of the city of New York or of Brooklyn, and to collect and receive the rents, issues, income, interest and profits thereof, and to apply the same to the use of Mrs. Whittemore and Mrs. Slosson, two of testator's sisters, respectively, for life, with remainders to the same nephews and nieces.

On August 10th, 1881, the executors having converted substantially all the assets of the estate into cash, which was deposited by them in the U. S. Trust Company, and being in a position to estimate how the estate would turn out, determined to make a partial distribution among the legatees, and accordingly paid all the legacies first above referred to, except one specified in the twenty-first clause of the will, and distributed among the residuary legatees, who were entitled to one third of the residuary estate under the twenty-ninth clause, the sum of $220,000, or $20,000 apiece; and, in pursuance of the same scheme, they purchased, on August 19th, 1881, U. S. 5 per cent. bonds extended during the pleasure of the Government at $3\frac{1}{2}$ per cent., of the par value of $442,000, costing $449,735, on account of the trusts, declared in the twenty-ninth clause of the will, in the remaining two thirds of the residuary estate. On this purchase, there was paid a brokerage commission of $552.50.

Subsequently, to wit, on March 1st, 1882, they made

a further purchase of U. S. 5 per cent. bonds, extended at the pleasure of the Government at .3½ per cent., of the par value of $25,000, costing $25,531.25, on account of the said trusts.   On this purchase there was paid a brokerage commission of $31.25.

On September 23rd, 1882, the U. S. Government called in the bonds last above mentioned, announcing that interest upon them would cease on December 23rd, 1882. But on October 12th, 1882, the Treasury Department ordered said bonds to be prepaid, with interest to December 23rd, 1882.

Thereupon, on October 12th, 1882, the trustees presented for redemption bonds of the par value of $25,000, receiving thereon the following sums : For principal $25,000; for interest from the last quarter day to the day of payment, $171.70; and for interest from the day of payment to December 23rd, 1882, $171.71.

On October 18th, 1882, the Government called in the residue of said bonds, announcing that interest upon them would cease on January 18th, 1883.   But on November 9th, 1882, the Treasury Department ordered the said bonds to be prepaid, with interest thereon to January 18th, 1883.

Thereupon, on November 10th, 1882, the trustees presented for redemption the residue of said bonds, of the par value of $442,000, receiving therefor the following sums : For principal, $442,000 ; for interest from the last quarter day to the day of payment, $381.45 ; and for interest from the day of payment to January 18th, 1883, $2,924.41.

On the foregoing facts, there arose the following

questions which were submitted to the Surrogate for his decision:

1st. As to the brokerage commissions on the purchase of the bonds,—should they be charged (*a*) to the estate of Henry Lawrence, or (*b*) to the trusts on account of which they were purchased.

2nd. As to the sums received on the redemption of the bonds, in excess of interest to the date of redemption,—should they be credited (*a*) to the income, and go to those entitled to the income, or (*b*) to the principal, and go to those entitled to the remainder.

3rd. As to the loss of premium on the bonds by reason of their redemption,—should it be borne (*a*) by the principal of the trust fund, or (*b*) by the income.

DAVID B. OGDEN, *for Beekman and Slosson, executors and trustees:*

1. As to the loss of premium paid on the purchase of the United States bonds.

The loss should be charged to income. The trustee's duty is to consider equally the interest of the life tenants and remainderman (2 Perry on Trusts, § *539*). The life tenant is concerned only with the interest or income—the remainderman only with the principal. Profit from the use of the money is the object of one, security to the fund the object of the other. So far as the remainderman is concerned, therefore, the trustees discharge their duty by simply keeping the fund safe, and if expenses are incurred for the purpose of attaining profit as well as safety, these expenses must be paid out of the profit, or in other words must go to diminish it.

Again, by the terms of the will, the life tenants are

entitled to the "income, interest and profits" of investments. Interest is compensation for the use of money. Income is gained from investments. Profits are the same (Abbott's Law Dict.; Burrill's do.). Interest or income presupposes the profits from the use of the trust fund (Townsend v. U. S. Trust Co., *3 Redf.*, *223*).

In Farwell v. Tweddle (*10 Abb. N. C.*, *94*), the court, at special term, decided that a loss of premium caused by the redemption of securities must be made good by scaling down the income if the time of redemption was fixed, but that, where the time of redemption was uncertain the loss must fall on the principal. It is respectfully submitted that the latter proposition is inconsistent with the former. It may be that a trustee could not scale down the income in such a case, for it would not be possible to determine at what rate the scaling should be done ; and this is the reason given by the learned Justice for his decision. But, where the trustee has in his hands when the redemption takes place, interest or income derived from other securities which can be withheld, to make good a loss which has actually occurred, this reason does not exist, and justice to the remainderman would seem to demand that the loss should be made good out of the income as soon as it is incurred. Moreover, in the case of the 5-20 bonds which were concerned in Farwell v. Tweddle, the chance of an immediate loss was remote, while in this case there was every probability that the bonds would speedily be redeemed.

A distinction must also be noticed between a loss to principal growing out of a failure to realize the sum

which the securities promise to pay, and a loss such as was made in this case.

2. As to the bonus paid by the Government on the redemption of the bonds. In Scovel v. Roosevelt (*5 Redf., 121*), this precise question came before the Surrogate. It was held that the sum paid by the Government to holders of bonds called, as an inducement to present them early for redemption, although termed a pre-payment of interest, was not in fact, "either interest or income, but merely a bonus offered by the U. S. Government to the holders of said bonds, as an inducement for them to refund the same in 4 per cent. consols;" and he decreed that the life tenants were not entitled both to the bonus and the interest earned by the funds after the redemption of the called bonds, but could receive one of these items only.

3. But in view of the claim made above, as to the loss of premium on the bonds, the following view is submitted as furnishing a fair and equitable solution of both questions. It is clear that, on November 10th, 1882, the day the bonds were presented for redemption, they could have been sold for their face value plus the bonus offered by the Government. This bonus was, therefore, exactly equivalent to a premium on the bonds, and the redemption may be considered as a sale to the Government at a premium. It would, therefore, be just to allow to the life tenants that amount as a premium diminishing the loss on the investment, which is the theory on which the account, under the first point, is made up.

If however, the court is of opinion that the loss of premium should be borne by the principal, then there

is no doubt that the rule in Scovel v. Roosevelt should be applied, and the bonus on the redemption of the bonds credited to principal.

4. The broker's commission on the purchase of the bonds should be charged to the trust funds for which the investment was made. The intention of the testator, as shown in the 29th clause of the will, was clearly that an equal division of his residuary estate into three parts should be effected.

The division of the estate was to precede any other act, and not until division had been made could any investment of the trust shares be made. How then, can it be claimed that the share which is set apart to the nephews and nieces absolutely, can thereafter be diminished by charging it with any portion of the broker's commissions upon the purchase of securities for the benefit of the other shares. The effect of such a course would be to attain not equality between the shares, but inequality; and it is hard to conceive any reason for charging the expense of properly investing the trust shares upon the other portion of the estate which would not equally justify charging the expense of investments made by the owners of such other share upon the trust shares.

S. P. NASH, *for Mrs. Whittemore, life-tenant:*

1. The rule invoked by counsel for the executors, that the safety of the principal, is, as between tenant for life and tenant in remainder, to be the controlling consideration does not apply.

That is a rule for the guidance of trustees in their investments. They have no right to imperil the princi-

pal in order to secure a bountiful income, and if they violate the rule, they are sometimes held liable to make good the loss.

But where they follow the rule by investing in securities sanctioned by the court, and are themselves free from blame, a loss to the principal is never charged against the life tenant. The life tenant loses for life the income on the reduced principal, and the tenant in remainder has to accept the reduced principal for the reason that, the trustees not being bound to make it good, and the principal being in fact impaired, there is no other way out. To charge the life tenant with it is to make him pay for the misjudgment of the trustee.

If an investment is made by the trustee on bond and mortgage, and, owing to events for which he is not liable, a loss occurs, and an investment, for example, of $10,000 yields on foreclosure $8,000, losing $2,000, there is no authority for holding that this loss falls on the life tenant. He loses the income on the $2,000 during the whole of his life, but he does not, out of his income on the $8,000, restore the principal.

2. But in the case at bar there are other considerations. Each of the two life tenants is, under the will, entitled to a third of the *residue* after that residue is determined.

Now, as to investments made by the executors *pending the settlement of their accounts*, losses or gains resulting from such investments are the losses or gains of the *general estate*, until that estate,—*the executors' accounts being first settled, and the residue ascertained*,— is turned into a trust estate. The executors cannot act both as executors and as trustees over the same fund

at the same time, and not till the *net residue* has been ascertained, and the part of it applicable to the trust estates been severed from the rest, do the executors lose their character as executors, and their acts become the acts of trustees, as distinguished from the acts of executors, so that such acts are to affect the special trust estate (Redf. Surr. Prac., *2nd ed., 426*).

That it is a matter of convenience, in a large estate which is being amicably liquidated, to anticipate the settlement of the accounts, to pay out legacies and to provisionally set apart funds for different beneficiaries, as has been done here, does not change the rule. Losses and gains while the executors are acting as executors only,—and they cannot act as trustees till the trust funds have been *definitely and finally* taken out of the trust estate,—fall upon or belong to the general estate, and the residue is to be ascertained accordingly as the estate is ultimately left.

If this be the rule, the gains made on selling the testator's securities, the losses unexpectedly incurred in the temporary investments made by the executors, including brokerage paid on making sales or investments, are gains, losses and disbursements of the executors, and, if not chargeable to them personally, as no one here contends, belong to the principal of the undistributed estate, before the residue is determined.

3. The alleged gains, made by the Government prepaying the interest, is in the nature of a bonus or extra dividend, and belongs to tenant for life (Perry on Trusts, § *544*).

THE SURROGATE.—It appears, from the statement of

facts agreed upon by the counsel for the respective parties to this proceeding, that the executors have made partial distribution of the assets of the estate among some of the persons entitled. For the purposes of such distribution, they purchased government securities, on account of certain trusts specified in the will.

In making these purchases, they paid about $550 for the services of a broker. It is not disputed that the sum was properly expended. I think that the disbursement should be charged against the principal of the fund on account of which it was incurred. The application of any part of the residue to the purpose, in the absence of an authorization by the testator would be unwarranted, and would prevent the equal distribution of the residue for which the will provides.

The executors were justified in investing the trust funds in the securities in question, even though that investment involved purchasing such securities at a premium. The loss incurred by calling them in for redemption is such a loss as, under the circumstances, should fall on the principal of the trust fund (Townsend v. U. S. Trust Co., *3 Redf.*, *223 ;* Farwell v. Tweddle, *10 Abb. N. C.*, *94*).

Such principal should be credited with the bonus of interest allowed by the government. This bonus was not "dividends," "issues" or "profits" of the investment, within the meaning of the provision of the will in this regard.

Decreed accordingly.